1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL ZANG,<br><br>                              Plaintiff,<br><br>v.<br><br>UMAMI SUSTAINABLE SEAFOOD, INC.,<br><br>                              Defendant. | Case No.:  15cv475 AJB (DHB)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Presently before the Court is Daniel Zang's ("Plaintiff") complaint asserting two causes of action: (1) breach of contract; and (2) breach of implied covenant of good faith and fair dealing. (Doc. No. 23.) On November 2, 2016, Defendant Umami Sustainable Seafood, Inc. ("Umami") filed a motion for summary judgment. (Doc. No. 37.) Plaintiff opposes the motion. (Doc. No. 40.) Pursuant to Local Rule 7.1.d.1, the Court finds the instant motion suitable for determination on the papers and without oral argument. Accordingly, the motion hearing set for February 2, 2017, is hereby vacated. For the reasons set forth below, the Court **GRANTS** Umami's motion for summary judgment.

I.     **BACKGROUND**

The instant action arises from a 2010 employment agreement (hereafter referred to as "the Agreement") between Lions Gate Lighting Corporation ("Lions Gate") and

Plaintiff. (Doc. No. 23 ¶ 9.) After a subsequent reverse merger, Lions Gate changed its name to Umami Sustainable Seafood, Inc. (*Id.* ¶ 19; Doc. No. 37-1 at 6; Neach Decl. Ex. 1 ("Zang Depo. I") 7:18-8:4, Doc. No. 37-3.)[1] Under the Agreement, Plaintiff was hired as Chief Financial Officer of Umami, and received an annual base salary of $179,000. (Doc. No. 23 ¶¶ 10, 11.)

In December of 2012, due to the actions of various current and previous shareholders, and creditors including Umami, Atlantis[2] and its wholly owned subsidiary Atlantis Kabushiki Kaisha (collectively referred to as "Atlantis"), were declared in default under various credit and collateral agreements. (*Id.* ¶ 24.) As a result of the foreclosures, Atlantis is no longer a shareholder of Umami, and Mr. Oli Steindorsson[3] ("Mr. Steindorsson"), Umami's previous Chief Executive Officer, is no longer a direct or beneficial owner of the shares in Umami. (*Id.* ¶¶ 23, 26.)

On December 8, 2012, Mr. Steindorsson was removed from his position as Chief Executive Officer and Chairman of the Board of Umami. (*See id.* ¶ 27; Lorenz Decl. Ex. 3 ("Fitzpatrick Depo. II") 6:9-11, Doc. No. 40-5.) The reason for Mr. Steindorsson's removal was that there was the concern that based on Mr. Steindorsson's past actions, that he would sell inventory from one of the companies and put that money into his own pocket; resulting in a devastating impact to Umami. (Fitzpatrick Depo. II 8:13-18.) Thus, the board agreed to remove Mr. Steindorsson without his knowledge, which required the board to form a plan in absolute secrecy. (*Id.* at 8:19-9:16.)

At around the same time, creditors took the collateral that they were entitled to and redistributed the shares that were previously held by Mr. Steindorsson.[4] (Neach Decl. Ex.

---

[1] Page numbers are in reference to the automatically generated CM/ECF page number and not the number listed on the document.
[2] At the time, Atlantis was Umami's largest shareholder, owning 62.1% of Umami's issued shares. (Doc. No. 23 ¶ 22.)
[3] Prior to the foreclosures, Atlantis was largely owned by Mr. Steindorsson. (*Id.* ¶ 23.)
[4] The Secured Creditors received their collateral through various agreements entered into with Atlantis who had secured its obligations by pledging its Umami stock as collateral. (Doc. No. 40 at 6-7.)

3 ("Fitzpatrick Depo. I") 8:21-24, Doc. No. 37-5.) These creditors included Daito Gyorui Co., LTD. ("Daito"), Victoria Ross and Donald M. Ross c/o Jones Gable and Company Limited (collectively referred to as "Jones Gable"), Robert Gudfinnsson c/o Salander Holdings Limited ("Robert Gudfinnsson"), Baja Aqua Farms, S.A. de C.V. ("Baja"), and Kali Tuna d.o.o ("Kali") (collectively referred to as "Secured Creditors").[5] (Doc. No. 23 ¶ 28; Fitzpatrick Depo. I 9:7-10:13.) The parties then increased their ownership of Umami or became financial owners of Umami, as defined in 17 C.F.R. 240.13d-3 ("Rule 13d-3")[6] as follows: (1) Daito 21.8%; (2) Robert Gudfinnsson 11.7%[7]; (3) Jones Gable 13.4%[8]; and (4) Kali and Baja 15.1%.[9] (Doc. No. 23 ¶ 28.)

In March of 2013, as a result of the events listed above, Plaintiff spoke to Mr. Tim Fitzpatrick ("Mr. Fitzpatrick"), Umami's former Chief Financial Officer and current Chief Executive Officer, stating that he believed a Non-Negotiated Change in Control ("Change in Control") had occurred. (*Id.* ¶ 31.)

Under Paragraph 4(c)(A)(iii) of the Agreement, Plaintiff may terminate the Agreement for "Good Reason." (*Id*. ¶ 12; Doc. No. 37-4 at 4.) Included in the Agreement's definition of "Good Reason" is "the occurrence of a Non-Negotiated Change in Control of the Company." (*Id.*) The definition of a Non-Negotiated Change in Control at issue in the present matter is:

> Any individual, corporation (other than the Company, any trustees or other beneficiary holding securities under any employee benefit plan of the Company, or any company owned,

---

[5] The Court notes that Mr. Fitzpatrick in his deposition states that the creditors who took collateral also included Sirius Ocean. (Fitzpatrick Depo. I 9:5-12.)

[6] 17 C.F.R. 240.13d-3 states that for purposes of sections 13(d) of the Act, a beneficial owner of a security includes any person who has or shares: (1) voting power; and/or (2) investment power.

[7] Mr. Gudfinnsson's 13d-3 states he owned 11.8%. (Doc. No. 37-9 at 2-3.)

[8] Jones Gable's attached 13d-3 document states that the number of shares it owned was 16.2%. (Doc. No. 37-7 at 3.) Victoria Ross also filed a 13d-3 which states that she had shares in the amount of 5.9%. (Doc. No. 40-10 at 2.)

[9] Plaintiff attaches to his Opposition a 13d-3 document for Motomax S.A. de C.V. (Doc. No. 40-12 at 2.) The Court is unsure of who this is, and whether or not they are one of the Secured Creditors at issue.

directly or indirectly, by the shareholders of the Company in substantially the same proportions as their ownership of stock of the Company), partnership, trust, association, pool, syndicate, or any other entity or any group of persons acting in concert becomes the beneficial owner (within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934) of securities of the Company possessing more than fifty percent (50%) of the voting power for the election of directors of the Company.

(Doc. No. 23 ¶ 14; Doc. No. 37-4 at 4.)

Subsequently, on March 13, 2013, Plaintiff wrote to Mr. Fitzpatrick pursuant to paragraph 4(d) of the Agreement and provided Umami with formal Notice of Termination for Good Reason. (Doc. No. 23 ¶ 33.) Additionally, Plaintiff's termination letter included a section that stated that per paragraph 5(a) of the Agreement, as Plaintiff wished to resign for "Good Reason," Umami shall:

(i) pay Employee's accrued but unpaid portion of the Annual Base Salary to the Employee in a lump sum in cash within twenty (20) days after the Date of Termination, (ii) continue to pay (in periodic intervals consistent with Company's regular payroll practices) pay the Annual Base Salary for the remainder of the Employment period, and (iii) if the termination takes place for Good Reason as a result of a Non-Negotiated Change in Control, the Company will pay the Employee two (2) times the Annual Base Salary in a lump sum in cash within thirty (30) days after the Date of Termination and permit all unvested options granted hereunder to be vested immediately.

(*Id.* ¶ 35; Doc. No. 37-4 at 5.)

Umami accepted Plaintiff's notice of termination, and Plaintiff's last day of employment was March 22, 2013. (Doc. No. 23 ¶ 39.) On March 31, 2013, Plaintiff

received his last paycheck. (*Id.* ¶ 44.) This paycheck only included payment of Plaintiff's prorated annual base salary, and accrued but unused vacation through March 31, 2013. (*Id.* ¶ 45.) Plaintiff claims that Umami withheld and/or deducted from his paycheck $42,500.00, and asserts that Umami owes him no less than $382,500.00, which includes the $340,000.00 he was owed for payment of two times of his annual base salary. (*Id.* ¶¶ 46, 47, 50.)

In May of 2013, Mr. Fitzpatrick wrote to Plaintiff and stated that Umami had determined that no Change in Control had occurred; thus no payments were due to Plaintiff under the Agreement. (*Id.* ¶ 51; Doc. No. 37-11 at 5-6.) Disagreeing with Umami, Plaintiff reached out to Mr. Fitzpatrick on more than one occasion between June and November of 2013 regarding Umami's decision not to pay. (Doc. No. 23 ¶ 52; Doc. No. 37-11 at 3-6.) Plaintiff contends that Mr. Fitzpatrick would not provide him with any explanation for why Umami believed non-payment was appropriate. (Doc. No. 23 ¶ 52.) On November 25, 2013, Plaintiff wrote to Umami's Board of Directors requesting an explanation for their decision that no Change in Control occurred. (*Id.* ¶ 53; Doc. No. 37-11 at 3.) Plaintiff then wrote Umami, through his counsel, on September 11, 2014 and October 3, 2014, again requesting payment pursuant to paragraphs 4 and 5 of the Agreement, or for justification for non-payment. (Doc. No. 23 ¶ 54.) Plaintiff alleges that Umami's Board of Directors has not responded to any of his requests. (*Id.* ¶ 55.)

On March 3, 2015, Plaintiff instituted this action against Umami. (Doc. No. 1.) On April 10, 2015, Umami filed a motion to dismiss, (Doc. No. 8), which was granted in part and denied in part on July 14, 2015. (Doc. No. 22.) On July 24, 2015, Plaintiff filed his first amended complaint ("FAC"). (Doc. No. 23.) Plaintiff asserts three causes of action: (1) breach of contract; (2) breach of covenant of good faith and fair dealing; and (3) violation of New York Labor Law 190. (*Id.* ¶¶ 56-80.) On August 10, 2015, Umami filed a motion to dismiss Plaintiff's third claim for relief, (Doc. No. 24), which was granted on September 30, 2015. (Doc. No. 29.) On November 2, 2016, Umami filed the present action, its motion for summary judgment. (Doc. No. 37.)

## II.   LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *Id.* at 322–23.

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth facts showing a genuine issue of a disputed fact remains. *Id.* at 330. When ruling on a summary judgment motion, the Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

### A.   <u>New York Law Applies</u>

Paragraph 9(a) of the Agreement plainly states that "[t]his Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to principals of conflicts of laws." (Doc. No. 37-4 at 7.) "In determining the enforceability of a choice of law provision in a diversity action, a federal court applies the choice of law rules of the forum state. . . ." *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009). The California Supreme Court has held that parties' choice of law should be respected if the "chosen state has a substantial relationship to the parties or their

transaction, or [] whether there is any other reasonable basis for the parties' choice of law." *Nedlloyd Lines B.V. v. Superior Court of San Mateo Cnty.*, 3 Cal. 4th 459, 466 (1992).

Here, the Agreement was executed while Umami's principal place of business was in New York. (Doc. No. 23 ¶¶ 8, 9; Doc. No. 37-1 at 10.) Thus, there is a "reasonable basis" for the parties' choice of New York Law. *See Peleg v. Neiman Marcus Grp.*, 204 Cal. App. 4th 1425, 1446 (2012). Moreover, both parties agree that New York law applies. (Doc. No. 37-1 at 10-11; Doc. No. 40 at 10-11.) Accordingly, the Court will apply New York law to Plaintiff's breach of contract and breach of the implied covenant claims.

B. <u>Plaintiff's Breach of Contract Claim[10]</u>

For clarity, the Court reiterates the relevant parts of the Agreement at issue in the present matter: (1) any group of persons; (2) acting in concert; (3) becomes the beneficial owner (within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934) of securities of Umami; and (4) possessing more than fifty (50%) of the voting power for the election of directors of Umami. (Doc. No. 37-4 at 4.)

Umami moves for summary judgment on Plaintiff's breach of contract claim asserting that: (1) there was no group that acted in concert; and (2) the lack of beneficial ownership by a "group" means no Change in Control occurred. (Doc. No. 37-1 at 11-15.) In direct contrast, Plaintiff argues that summary judgment is not warranted because: (1) the Secured Creditors acted in concert by agreeing to forbear on foreclosing on their various credit and collateral agreements; and (2) the Secured Creditors were a group that obtained more than 50% of beneficial ownership in Umami following the Change in Control. (Doc. No. 40 at 11-19.)

///

///

---

[10] A plaintiff must plead and prove three elements to establish a prima facie case for breach of contract: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach. *Nat. Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). The parties do not dispute that there was a valid contract. The only question is whether Umami breached its duties as set forth in the Agreement.

i.     <u>A Genuine Issue Of Material Fact Remains as to Whether a "Group"</u>
<u>Obtained Beneficial Ownership of Umami</u>

Umami argues that the term "group" has a well understood meaning that does not include creditors foreclosing on cross-defaults. (Doc. No. 37-1 at 14.) In addition, by its terms, Umami contends that Section 4(c)(x) incorporates the provisions of Rule 13d-3 which provides:

> (a) For the purposes of 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
>
> (1) Voting Power which includes the power to vote, or to direct the voting of such security; and/or
>
> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. 240.13d-3. (*Id.* at 13.) Thus, as there is no evidence indicating that the Secured Creditors had any kind of understanding to share voting or investment power, no "group" held beneficial ownership of Umami stock. (*Id.* at 14-15.) In opposition, Plaintiff contends that his reading of the term "group" in the Agreement's context was not limited to Rule 13d-3, but included any combination of people acting in concert. (Doc. No. 40 at 19.)

Under New York law, "[c]onstruction and interpretation of an unambiguous written contract is an issue of law within the province of the court." *Maser Consulting P.A., v. Viola Park Realty, LLC*, 91 A.D.3d 836, 837, 936 N.Y.S.2d 693 (N.Y. App. Div. 2012). "Pursuant to well-settled rules of contract interpretation, 'when parties set down their agreement in a clear, complete document, their writing should be as a rule be enforced according to its terms.'" *In Re El-Roh Realty Corp.*, 74 A.D.3d 1796, 1798–99, 902 N.Y.S.2d 727 (N.Y. App. Div. 2010) (citation omitted). "[I]f the contract is ambiguous and relevant extrinsic evidence as to its meaning is available, its interpretation is a question of

1  fact for the factfinder." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442
2  F.3d 101, 111 (2d Cir. 2006).

3        Having reviewed both parties' arguments and the applicable law, the Court finds that
4  there are disputed issues of material fact as to whether a "group" acted in concert. First,
5  both parties dispute the meaning of "group" as defined in the Agreement. Umami argues
6  that "group" is defined by Rule 13d-3. (Doc. No. 37-1 at 13.) Thus, the group must share
7  voting or investment power. (*Id.*) However, Plaintiff disagrees and argues that as the word
8  "group" is placed in the Agreement's paragraph containing broader language, the
9  Agreement does not explicitly limit "group" to be defined by Rule 13d-3. (Doc. No. 40 at
10 19.) Second, even if Rule 13d-3 were to apply to the definition of "group," both parties
11 dispute what criteria should be used to classify a "group." Umami cites to *Dreiling v. Am.*
12 *Online, Inc.*, 578 F.3d 995, 1002–1003 (9th Cir. 2009) to argue that the "key inquiry" in
13 these cases is whether the alleged group "agree[d] to act together for the purpose of
14 acquiring, holding, voting or disposing" of Umami stock. (Doc. No. 37-1 at 14.) In contrast,
15 Plaintiff cites to *Morales v. New Valley Corp.*, 999 F. Supp. 470, 475 (S.D.N.Y. 1998) to
16 assert that the "touchstone of a group" within the meaning of Section 13d-3 is that the
17 members "combined in furtherance of a common objective." (Doc. No. 40 at 18.) Finally,
18 Plaintiff argues that his own understanding of the word "group" is not limited to Rule 13d-
19 3. (*Id.* at 19.)

20       In light of Plaintiff's assertions stated above, the Court finds that Plaintiff has
21 satisfied his burden in providing evidence that demonstrates that the word "group" is
22 ambiguous. *See Compagnie Financiere De Cic Et De L'Union Europeenne v. Merrill*
23 *Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–158 (2d Cir. 2000) ("[c]ontract
24 language is ambiguous if it is 'capable of more than one meaning when viewed objectively
25 by a reasonably intelligent person . . .'") (citation omitted). Moreover, in regards to what
26 the key inquiry of a "group" is for purposes of Rule 13d-3, the Court notes that Umami's
27 case law is unpersuasive as it cites to cases from the First and Ninth Circuit instead of the
28

15cv475 AJB (DHB)

Second Circuit.[11] Accordingly, finding a rational basis for the difference in opinion as to the understanding of the word "group," the Court finds summary judgment as to this aspect of Plaintiff's breach of contract claim inappropriate. *See Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir. 1994) (holding that summary judgment is proper in a contract dispute only if the language of the contract is "wholly unambiguous"); *see also Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 142 (N.Y. Ct. 2004) ("Whether a contract is unambiguous is a threshold question. The existence of an ambiguity depends on whether there is a reasonable basis for difference of opinion as to the meaning of the contract.").

### ii.   Plaintiff has Failed to Provide Evidence of a Group "Acting in Concert"

The Court now turns to its next inquiry: whether a genuine issue of material fact exists as to whether a group "acted in concert." Umami alleges that Plaintiff's own testimony shows the Court that there is no indication that any of the Secured Creditors "acted in concert." (Doc. No. 37-1 at 12.) In addition, Umami highlights that Daito's filed Schedule 13D[12] with the Securities and Exchange Commission ("SEC") specifically states that it is filing "not as a group."[13] (*Id.*) Accordingly, without Daito and its 21.8% holding in Umami's stock, Umami argues that the Secured Creditors could not have created a Change in Control with over 50% of the voting share. (*Id.* at 12-13.)[14]

In opposition, Plaintiff alleges that there is ample evidence to support the idea that the Secured Creditors "acted in concert" to facilitate Mr. Steindorsson's removal as CEO of Umami. (Doc. No. 40 at 12.) Plaintiff also asserts that the evidence reveals that the

---

[11]Umami requested and the Court granted, *supra* pp. 6-7, that New York Law applies to the instant matter.

[12] When a person or group of persons acquires a beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Securities Exchange Act of 1934, they are required to file a Schedule 13D with the Securities and Exchange Commission. (*See Generally*, Doc. No. 37-6.)

[13] Daito checked box "b" on Line 2 of its Schedule 13D. As Code of Federal Regulation §240.13d-101 provides, the reporting party checks box "b" if it "disclaims membership in a group" or "does not affirm the existence of a group." (Doc. No. 37-1 at 12.)

[14] Umami also cites to a New York case to argue that the meaning of "acting in concert" requires something more than a "common objective." (Doc. No. 37-1 at 12.) As this case cited by Umami involves a charge for harassment, the Court finds its definition to be unpersuasive to the matter at hand.

Secured Creditors acted in concert by "agree[ing] to forbear on foreclosing on their various credit and collateral agreements until December 2012 . . . ." (*Id.* at 13.)

Here, the underlying facts and evidence presented by both parties, as well as the deposition testimony of Plaintiff could not permit a rational trier of fact to find that a group "acted in concert." Significant to the Court's determination is the fact that Plaintiff provides no evidence to show that Daito, Robert Gudfinnsson, Jones Gable, Kali, and Baja each came together in union to act as a group. Instead, Plaintiff asserts in his Opposition that Mr. Fitzpatrick acted on behalf of Robert Gudfinnsson and Jones Gable to transfer their secured collateral shares in Umami into their own respective names. (*Id.* at 14.) Then Plaintiff claims that Mike Gault, a member of Umami's Board of Directors, had been working with Daito to prevent Daito from foreclosing on its collateral prior to finalizing Umami's removal of Mr. Steindorsson. (*Id.*) However, the shortcomings of Plaintiff's assertions are that they are devoid of any evidence to support Plaintiff's conclusion that all five of the Secured Creditors "acted in concert." Thus, this piecemeal attempt by Plaintiff fails to satisfy his burden of demonstrating that a genuine issue of material fact exists.

Moreover, Plaintiff's own deposition testimony admits that he has no facts or evidence of the Secured Creditors acting together, but merely that he has based his allegations on his own inferences of the situation. (Zang Depo. I 17:14-24; Lorenz Decl. ("Zang Depo. II") 9:4-23, Doc. No. 40-14.) Plaintiff counters and argues that the actions of the Secured Creditors had to be done in complete secrecy so as not to warn Mr. Steindorsson of his impending resignation. (Fitzpatrick Depo. II 9:10-16.) Thus, Plaintiff contends that though he does not have all of the facts, the complete removal of Mr. Steindorsson could only be accomplished through the concerted actions of the Secured Creditors. (Zang Depo. II 4:9-25.) However, the Court notes that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Thus, despite the arguments advanced by Plaintiff in support of the conclusion that a group "acted in concert," the Court finds that Plaintiff has not provided evidence or facts

to withstand a motion for summary judgment. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 586 (finding that the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts"); *see also Anderson*, 477 U.S. at 256 ("[a] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.").

Accordingly, though Plaintiff was able to demonstrate that a genuine issue of material fact exists as to the definition of "group," Plaintiff has failed to satisfy his burden in providing the Court with any specific facts to demonstrate that the Secured Creditors "acted in concert." *See Zuckerman v. City of New York*, 49 N.Y.2d 557, 563, 404 N.E.2d 718 (N.Y. 1980) (granting summary judgment as the city's arguments were considered speculation and this was "patently inadequate to establish the existence of a factual issue requiring a trial . . ."). Consequently, as currently configured, a reasonable jury could not return a verdict for Plaintiff in regards to his breach of contract claim. As a result, Umami's motion for summary judgment is **GRANTED**.

C.    Plaintiff has Failed to Demonstrate that a Genuine Issue of Material Fact Exists Regarding his Breach of Implied Covenant Claim

Next, the Court turns to Plaintiff's claims for breach of implied covenant. Umami argues that the undisputed evidence, including Plaintiff's own admissions, demonstrates that Plaintiff received an immediate communication from Umami stating that it believed that no Change in Control had occurred. (Doc. No. 37-1 at 15.) In addition, Umami asserts that Plaintiff's own testimony that he had already accepted a job offer with a new company demonstrates that Umami did not induce Plaintiff to terminate his employment. (*Id.*) In opposition, Plaintiff contends that Umami accepted his termination for good reason without intending to pay him pursuant to the Agreement. (Doc. No. 40 at 27.)

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289 (N.Y. 1995) (citation omitted). Under New York law, a covenant of good faith and fair

dealing implies that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006).

Here, Plaintiff's own deposition shows that he was aware that Mr. Fitzpatrick and Umami agreed that no Change in Control had happened. (Doc. No. 37-1 at 15; Zang Depo. I 20:12-21:21.) Specifically, Plaintiff admits that Mr. Fitzpatrick was "100 percent consistent" in communicating to Plaintiff that a Change in Control did not apply. (Zang Depo. I 20:12-16.) Therefore, the Court finds Plaintiff's assertion that Umami induced Plaintiff to terminate his employment with the understanding that they would not pay him for the alleged Change in Control is without merit.

Additionally, Plaintiff tries to argue that he was forced to leave his position as Mr. Fitzpatrick would not discuss Plaintiff's continued employment with Umami, and informed Plaintiff that Umami was in a difficult financial position. (Doc. No. 40 at 21.) That then put Plaintiff in the position of being unemployed or having to look for a new job. (*Id.*) However, the evidence presented by Plaintiff is a far cry from proving breach of implied covenant. All Plaintiff has shown is that he was employed by a company in financial distress, and believing that a Change in Control happened, despite being told that no such change had occurred, he chose to terminate his employment. None of the evidence presented by Plaintiff goes to show that he was induced to terminate his employment under the guise that he would be paid under the terms of the Agreement providing for termination for Good Cause.

On a final note, this claim fails for a separate reason. The Court highlights that this claim as well as Plaintiff's claim for breach of contract assert that the underlying wrong is Umami's failure to pay Plaintiff according to the terms of the Agreement. Accordingly, as this claim is duplicative of Plaintiff's breach of contract claim, it is dismissed. *See Lorterdan Prop. At Ramapo I, LLC, v. Watchtower Bible and Tract Soc'y of New York, Inc.*, No. 11-CV-3656 CS, 2012 WL 2873648, at * 8 (S.D.N.Y. Jul. 10, 2012); *see also Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299 (N.Y. Ct. 2012) ("New York

law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.") (citation omitted). Accordingly, Umami's motion for summary judgment is **GRANTED** as to Plaintiff's claim for breach of the implied covenant.

<u>**CONCLUSION**</u>

For the reasons stated more fully above, the Court **GRANTS** Umami's motion for summary judgment as to Plaintiff's breach of contract and breach of implied covenant of good faith and fair dealing claims.

**IT IS SO ORDERED**.

Dated:  February 16, 2017

Hon. Anthony J. Battaglia
United States District Judge

15cv475 AJB (DHB)